Thank you, Judge Hurwitz. Good morning and may it please the court. My name is Steven Paintinger from the Office of the Federal Public Defender. I represent Appellant Sean Cutting in the Consolidated Appeals. I've been allotted 10 minutes of time during which I will address the Speedy Trial Clause claim and the improper admission of hearsay under Federal Rule of Evidence 8035. I'd like to reserve two minutes of time for rebuttal, please. Your Honors, the defendant's Speedy Trial Clause claim presents a unique case, not because it involved a superseding indictment, but because of the District Court's factual findings regarding the reason for the delay under Barker's second factor. In particular, the District Court found that at the time the government filed the original indictment, it had already investigated all of the charges that it filed in the superseding indictment. It could have filed all of those charges at the original indictment, but instead the government deliberately and intentionally chose to hold back those charges so that it could file them late in the day, that is, close to trial. This court's finding is that the government deliberately and intentionally delayed makes this case unique amongst Speedy Trial Clause opinions. I'm aware of only one other Court of Appeal opinion that involves intentional, unjustified delay on the part of the government. That is the baddest opinion in the Third Circuit, and the Court found a constitutional violation there. So let me ask you, let me cut to the chase on this one. Is it your position that the government's bad faith justifies dismissing under the Sixth Amendment, even in the absence of prejudice? That is my position, and the District Court, to be clear, District Court did not go so far as to find bad faith. No, I understand, but you're characterizing it. However, however you characterize it, what the government did in this case, you think justifies dismissal even in the absence of prejudice? Yes, Your Honor, I do, because while I do take issue with the question of whether we've demonstrated actual prejudice, I believe the defendants have, both for lost witness memories, as well as a box with missing presumptive prejudice, Your Honor, because this Court has held in Alexander and Aguirre that where there is intentional delay, excuse me, that presumptive prejudice varies both with the length of the delay and the reason for the delay, and the reason. And what this means, Judge Hurwitz, is that when the government intentionally and deliberately delays, the presumption of prejudice is even more potent than if they had negligently delayed. And again, this harkens back to the Faddis opinion that I refer to. In Faddis, the Third Circuit encountered a circumstance in which there was intentional delay and only 35 months, not only, 35 months of delay that was attributable to the government, and solely on the basis of presumptive prejudice, the Court found a constitutional violation. And that's also important because when there is presumptive prejudice, and it's intentional delay, as it was here, the government bears the burden of rebutting that presumption and proving that the delay did not impact the defendant's ability to prepare their case. They did not do that. That's this Court's opinion in Mendoza, and the Third Circuit elucidates that in the Velazquez opinion as well. Mr. Koeniger, I don't think there's no reason why the government couldn't have brought the new charges into the wholly separate case, right? Well, the government's charging decision is its own, and what I don't submit, I don't concede that that would not possibly present a Sixth Amendment problem. For example, if the government did this to circumvent the Sixth Amendment, I don't think that that precludes a constitutional violation. But Judge Brack, I think you're referring to the Gregory opinion, which made this language. It did that, but more importantly, Gregory counted from the original indictment, assuming in part because the government made a decision to charge the way that it did. It chose to charge it in the superseding indictment, and I submit it did so here because it was seeking a joint trial. And so the question before the Court here, as it was in Gregory, is what was the decision the government actually made here? Not a hypothetical decision. The government chose to charge in the superseding indictment. There's plenty of cases in which demonstrate that the delay must be counted from the original, and something I'd like to illustrate on that point is the second Barker factor. The Supreme Court has identified this factor as being particularly flexible. That's the Loudhoff opinion. This Court has termed it the focal inquiry, and it's important here because any delay on the part of a superseding charge can be addressed in the second factor. The government will always have the opportunity to come forward and explain to the Court the reasons for its delay under the second factor, and so long as they are legitimate, there's not going to be a speedy trial clause violation. So, for example, if the government is still investigating the charges, it could come forward at the second factor, let the Court know that, almost certainly not an invalid reason. If the government has new evidence, almost certainly not an invalid reason. Those reasons do not exist here, and that's important. I guess I'd like you to respond to the following point, which is it seems that the upshot of all of this was that the trial moved from March 2017 to October 2017. That was the ultimate effect of this. In light of that, where is the prejudice, particularly of a speedy trial clause, right? I understand the prejudice potentially being forced to go to trial in March based on new charges that your clients only found out about some months before, but ultimately what happened is that the trial date gets moved to October 2017. You make a number of powerful points about why the government didn't bring charges earlier, but at the end of the day, why don't you invest the spending directly? I will, Your Honor, and again, I do want to address your question, but presumptive prejudice alone is sufficient here. But the actual prejudice was not just the being forced to go to trial, and this is demonstrated in our brief. There were faded memories of two bank directors, that's at excerpts of records 1588 to 89. The government conceded at excerpts of record 1468 that directors had faded memories, admitting, quote, that some didn't have a clear recollection when they were reinterviewed. The problem, Judge Brett, is by holding back these charges, hiding these charges, the defendants were precluded from conducting investigation two and a half years earlier with the directors to better crystallize their memory at that time. And it's important for the defendants' claims here because with respect to the bank fraud, the Petaluma Greenbrier loans, et cetera, part of the defense was that the directors knew what was going on here, and the result of that was that the loss of memory of what happened here. Director Bob Nicholas at excerpts of record 3139 testified that he had no recollection at all of the January 2019 Greenbrier meeting. Kelly Bruns also testified to no recollection of that meeting. Both Bruns and Thompson testified to no recollection of the Petaluma Greenbrier meeting. That is actual prejudice, Judge Brett, and we have a lost box of documents as well from the FDIC. That is actual prejudice. And I'd also like to point the court to the floor. Well, let me ask you, do we have, I know it's hard when witnesses say they don't remember, but did the defense have some theory about how these witnesses would have been helpful, where these boxes would have been helpful, had you been aware earlier of the superseding charges? Well, we submit that the witnesses' recollections would have revealed that the Greenbrier loan, that NYSE lessee's involvement in these loans was known. And what I'd like to point here to George Hurwicz is the Florida v. Dickey opinion of the Supreme Court that under these circumstances, we're not required to prove exactly that there would have been exculpatory. No, I understand. I understand. But for example, if you had a case where some other witness testified to what these witnesses might've said, had they had a good recollection, we might conclude there was no prejudice. If you had three witnesses say, I was at that meeting and here's what happened, and you couldn't get the fourth to remember, we might conclude that not having the fourth didn't add prejudice. That's what I'm trying to find out. I understand. And the only director who testified was Mr. Nikola. That's the only director who and Ms. Thompson were present at these meetings. They could not recollect these meetings either. And these meetings were important. Your Honor, I'd like to quickly turn to my hearsay claim because it's important here. I submit, although we have submitted that this is a de novo review issue, I want to emphasize that we prevail under either an abuse of discretion standard or a de novo review for one simple reason. Every circuit court of appeal who has addressed hearsay statements of this kind has held that a document is not a recorded recollection in a jointly made circumstance unless both witnesses testified to the accuracy of their contribution. Every circuit court has held that. And for prejudice purposes, this was extraordinarily prejudicial to Mr. Cutting in particular. Our brief addresses prejudice to all three, but for Mr. Cutting, this was extremely prejudicial. And I'd ask the court to look carefully at the closing argument and the rebuttal argument. I want to ask you a question about the document and just change the facts a little bit. Let's assume that the witness dictates the document, never looks at it again until the time of trial, and then says, yeah, that's what I dictated. I remember the meeting and now that I look at this, this refreshes my recollection. That's what I dictated. Are you saying it doesn't come in under 803-5 under those circumstances? If I might be clear, Judge Hurwitz, are we talking about the recording itself or a later document, as in this case, that was prepared by another person? That's right. I'm talking about the document. I'm talking about the document. The witness says my normal course is to dictate stuff after meetings. I did after this one. As I sit here today, I don't remember what I said. I'm looking at this document. Yeah, that's what I said. Is it admissible under 803-5? It's not, Your Honor, because it depends on the timing. The timing here was seven years later. Leave the timing out for a second because I'm not sure it's relevant. My question is really whether he had adopted his own statement. Typically, we worry about adoption when a third party says something because we want to make sure about a meeting. Here, he says, I know I dictated something. I know my secretary transcribed it. I know she's good at transcribing. Now I've looked at this, and yeah, this is what I said. If that's the case, why hasn't he adopted the secretary's transcribing? There's two faults in that, Your Honor. One is that this is a hypothetical. Then I want to ask you why that isn't what first? Well, it depends. Again, I know you're asking me to leave out the timing, Your Honor, but I can't because that's an important part of 803-5. What part of the case law says that adoption has to be contemporaneous with the statement? That's what I can't find. The rule itself says it has to be at a time when the document was fresh in the witness's mind. Seven years went by here, Your Honor. In this case, seven years went by before Mr. Garris looked at this document. It was dictated. A third party transcribed it. We know nothing about that assistant, by the way. He has multiple assistants. We know nothing about who actually did the transcription, whether it was a temporary employee, full-time employee, whether they actually followed instructions. This is important, Your Honor, but more importantly, seven years passed before he looked at this document. The document itself says that it was transcribed, but not read. Mr. Garris did not read this document until preparing for trial seven years later. And so that's why it's critical here. He did not adopt this document when it was fresh in his mind. He did not read it at the time that it was transcribed. It went into the file and it sat there for a number of years. And so any assertion that this is exactly what I said is based on an assumption. It's based on two assumptions. One is that he could possibly remember with such great detail something that happened seven years earlier. But more importantly, and this is what is key here, we need testimony from the person who did this to say that it's accurate. He can't say it's accurate. He didn't read it. And we know nothing about the specifics. And maybe Judge Hurley can allow us to keep... Yeah, please. As I said at the beginning, this is a complex case, so I don't want to hold everybody strictly to time limits. So I want to... Let's set... 8035 has made an adopt. Let's set made off to the side, because I understand your position on that. I want to focus more on adopt. So is it your argument that under adopt, for someone to have adopted a statement for purposes of a recorded recollection, they need to have done some kind of formal either I'm trying to get at what you think he needed to have done after his secretary prepared a memo to make this an adopt. I don't think that there's a requirement that he actually signed the judge breast, but there's a requirement that he actually refused it, that he actually looked at the document. One cannot adopt it. And this goes back to the Senate report that is cited in my brief, the Williams opinion from the Sixth Circuit to stuff that the Senate report, Congress contemplated that the witness is actually going to review the document or the statement. Not that it's seven years later, but actually review it in order to adopt that statement. The question I have is I don't think you need a signature either. But so why wasn't it here? He's the one who makes audio recording. He testified to having a process in place for these kinds of documents. The document was then put away in his file for it's part of his standard practice where he uses these sorts of documents. Given all of that. I'm sorry, I'm getting some feedback, but I think I understood the question to be what you were describing judge breath was more akin to the business documents exception rule 8036, which was not applicable here because the district court found that this document was prepared in anticipation of litigation. The government has not contested that finding, and it has not offered that exception as an alternative for affirming. Again, the reason that it matters is because there is a third human component in this circumstance. There is the statement at issue is not the statement of the witness. It is the statement of the transcriber. That is this court's opinion in areas. And in that circumstance, it's their assertion for the truth, what they heard being stated, whether it's on a recording or whether it's a witness who's testifying live. And so the problem, your honor, is that we are not hearing from that person to understand that they were doing their job accurately. And that is the case, even in areas with a court reporter who is who is trained to do this did it accurately, which is why this would come in perhaps on a different exception for public records as well as recorded recollection. But even in areas when noting the transcript that issue, this circuit held that the court reporter had to testify to the proper foundation for that document to be to be his or her recorded recollection. Don't you think there is a difference because the witness who has his or her testimony transcribed has no basis to testify to the overall process of the court reporter, whereas here Mr. Garish was able to explain the process he used in his law practice and the utilization of secretaries and the methods that were undertaken to ensure the accuracy. So that does seem a little bit different than the court reporter situation. Well, then let me get to the crux of the issue. Mr. Garish testified that he expects that this will happen. He kept testifying that it happened, that the test, that his assistants did this accurately. He doesn't know. And part of the problem, Judge Bratz, and why we need to have the assistant is because that assistant has to testify to his or her process and that she actually followed instructions or that he actually followed instructions, because the huge assumption here is that employees do exactly what their employers tell them 100% of the time. And we know from from experience and common sense that that's not correct. We know nothing about this person. We don't know whether they did their job well. We don't know whether they had been reprimanded by Mr. Garish for other reasons. We don't know whether they thought the fact that Mr. Garish sent hundreds of these recordings back to his office and never read the transcription means that they really were not very careful in the way that they transcribed. Mr. Kennedy, I want to bring this to a close, but we'll give you some more time later. I have one other question. Yes, Your Honor. You don't need the transcriber if it's adopted, do you? If it's adopted at a time when the, when the, when the... Yes, I mean, I understand the time limit of subjection, but let's assume I send it to an unknown transcriber. She sends it back to me and I read it and put initial and 100% approved, then I don't need the transcriber. Sure, and I think an example of this would be this court's opinion in Edwards, Judge Hurwitz, the 1976 opinion where the witness, even though he was intoxicated, reviewed it at the time and affirmed the content. Then you don't need to bring the person who actually wrote it because it was adopted by the witness at the time that, at the time when it was fresh in his memory. But again, and I don't want to beat a dead horse, we're talking about seven years later. No, I understand. And then my last question on this is, so under your reading of 8035, if the secretary or transcriber came in and said, I listened to the tape and this is an accurate rendition of what was on the tape. And Mr. Gerrish said, I've got no idea. Would it, could it come in? Because if she's the one making it, then... The two parts, Judge Hurwitz would be this, Judge, Mr. Gerrish would have to testify at the time that I transcribed, that I made this dictation. Right. I did so accurately. And it's not just my position. It's the position of third circuit, the seventh circuit, the tenth circuit. I understand. I understand. But in your view, it could be introduced through the secretary after Mr. Gerrish said, I sent tapes off. I dictate the tapes. So whatever's on the tapes is on the tapes. And she came in and said, I made it and it was very accurate. Correct. If, the assistant testified to the accuracy under process examination, then yes, which of course is absent here. And I appreciate the extra time, Your Honor. And I hope to reserve some additional time for rebuttal. Well, I'll tell you what, we'll, after we hear from the government, we'll figure out whether we need to give people more time for rebuttal. But this has been helpful. Thank you, Judge, I appreciate it. Mr. Harris, I think you're up next. Thank you, Your Honors. And good morning. I'm George Harris. I represent David Lonage, and I'm going to address the jury instruction issues. And I want to turn first to the knowingly instruction and its impact on both the money laundering and the misapplication of bank funds charges. What's at issue is the second sentence of the knowingly instruction as given by the court. Which is a slight variation of the second sentence of the model instruction, instruction 5.6. Mr. Harris, I know you've got limited time. So let me ask you the question that I think central to me on this. As I read your briefing, it's not that you think that the knowingly instruction was inaccurate. It's that you thought it made the instructions on the several crimes that had a higher mens rea misleading. Is that a fair summary of what you're saying? Yes, Your Honor. And that's the holding of this court's decisions in Stein and Terman as reflected in the model rules comments themselves. Well, so here we have a knowingly instruction that I think is by itself unobjectionable. And then we have instructions on the other crimes which seem to be correct in saying you need a, you need something more. They need to know what they were doing was wrong. So how was the judge supposed to instruct the jury in those cases? Well, the, what Stein and Terman hold and what the comments to the model instruction say is you don't give that second sentence in this circumstance. So, you know, we have rule 5.6 itself, which was the basis of the instruction here. And the comments say the second sentence of this instruction should not be given where an element of the offense requires the government to prove the defendant knew what the defendant did was unlawful. If we look at the comments to the money laundering instructions, they say, because it is a specific intent crime, it is reversible error to give instruction 5.6 in a money laundering case. You just don't give that instruction. And so here, I mean, the court gave a slight variation of the second sentence. The model instruction, what was given in Stein and Terman are the government is not required to prove the that an act is committed knowingly, the government is not required to prove, but that slight change is not substantial here. It doesn't cure the problem identified by the court in Stein. Well, I guess that's kind of the question, right? I mean, it doesn't, is it a slight change or is it actually a more material change under NAP? I mean, it seems that under NAP, this is a difficult argument for you. Well, Your Honor, I don't think it solves the Stein problem and it is not comparable to the change in the instruction in NAP. And here's why. What does it try to do? Presumably, it distinguishes an act done knowingly from just knowledge. So it distinguishes the instruction of knowingly engaged in a monetary transaction from the instruction knew the transaction involved criminally derives property. You know, one presumably is an act and the other is not. But that was exactly the situation in Stein. It's exactly the situation in Terman. And what the court said in Stein is the instruction purports to apply to all of the defendant's actions, its predicate acts of fraud, as well as its secondary act of money laundering. And there, the language was the same. It was new that the property represent the proceeds of securities, fraud, et cetera. In Terman, it was new involved criminally derived property justice here. So that distinction, you know, between knowingly and new and just saying it only applies to an act, that wasn't sufficient. I think I understand your argument on this point. I do want to hear what you have to say on the wire fraud points. I don't mean to move you along with other questions, but I know your time is short. Yeah, so certainly, I'll move on. And I would just say on that, as to the money, adding that as to money laundering is quite a different sort of variation. And that does point to one of those two and not the other. So turning to the wire fraud instruction here, the court instructed the jury that it could find wire fraud based on omitted facts, right? That was an error as a matter of law because there was no fiduciary relationship with alleged victims and therefore no duty to disclose and no foundation for the instruction. The government argues, well, they're informal fiduciary relationship. They shared information under a confidentiality agreement. But that argument fails as a matter of law. And it fails based on the very cases that the government relies on. Milovanovich and Shields require that the party acts for the benefit of another. They find that there's a duty only when there's an agency-like relationship, something similar to an employee relationship or an independent contract relationship, perhaps, if it has that same sort of acts for the benefit of another. We don't have that. I just want to, I want to understand where you draw the line. I mean, are you saying Lonish was just in a deal opposite Dedek and as a matter of law, he just could not be in a fiduciary relationship because he was on the opposite side of the deal? Yes, yes. There's just absolutely no authority that supports that a lawyer acting for a client in a transaction with a counterparty acts for the benefit of the counterparty and owes a fiduciary duty. And there was no basis for that here. I guess I'm not, I guess I wonder whether the situation and notwithstanding the fact that the parties were in that posture, there wasn't, there was in fact an issue of a relationship of trust and confidence and their argument could be unsuccessful. But as to whether it's impermissible, I mean, I guess I have more questions about that. Well, Your Honor, I think it is impermissible as a matter of law. This instruction should not have been given because there was no evidentiary foundation for it. If we look at the facts of Milanovic and Shields, very, very different. We have in Milanovic, we have independent contractors administering and certifying tests for the state of Washington. They're agents of the state of Washington. In Shields, we have the defendants soliciting and obtaining millions of dollars from investors who are investing on their behalf. These are fiduciary relationships. Negotiating a deal for at arm's length, no, it just does not support the duty to disclose here and therefore the instruction that wire fraud could be found based on omitted facts. So I want to ask you one other question about this. Let's assume you're not making this efficiency the evidence argument with respect to wire fraud. So I'm assuming that had the judge not given the omission part of the instruction and just given the rest of the instruction on wire fraud, you'd have no complaint, right? That's correct, Your Honor. But the problem is we don't know. No, I understand. I understand you don't know. So now my question is, what do we do about the prejudice issue? Do we assume it? Do we look to see whether the evidence on the other theories was strong? What do we do? Well, the issue here, because the jury was improperly instructed on an element of the offense, is that there has to be a harmless error beyond a reasonable. That's my question. Well, I'm not sure. Whatever the standard is, why wouldn't we find it harmless in a case where there's lots of other evidence of non-omission bad conduct? Well, because here, number one, the prosecution argued to the jury, you know, omitted facts, Majesty and Lowrench House worked closely together. This wasn't passed down to Dead X. And we have an acquittal on count 16, which is the other wire fraud count, where there was an email to Terra Capital. And if we look at the record, 4414 to 17, that's such a record. We see there that the email included exactly those disclosures which the government argued were missing from the other ones. That Majesty was a contractor, property manager, directly involved in the transaction, and the jury acquitted. So the government says in response, oh, well, maybe they acquitted on that because they wondered about interstate commerce or some other reason. But there's no basis for that in the record. There's no indication that was even argued. So we have a direct demonstration here that it made a difference. The jury acquitted where omitted facts didn't work. It convicted where omitted facts would have worked. So we don't know what the jury found. In fact, I would want to ask, my impression was that the same instruction was given with respect to count 16, wasn't it? That's correct. Exactly. Exactly. Okay. So I'm not sure which way that cuts. I mean, if the instruction were so prejudicial, one would have thought that they would have convicted on both. In this case, it seems to me they made some distinction based on something other than omitted facts didn't work with regard to tariff capital they acquitted. So that suggests that omitted facts was important to the jury. In the other counts where there was a conviction, omitted facts did work, but it was impermissible. So there's no way to discount the possibility that that was the basis on which they found conviction here. I understand. Thank you. We've taken you over, but we'll give you some time for rebuttal later. We'll move on to Ms. Drouse unless one of my colleagues has more questions for Mr. Harris. Thank you, Your Honor. Ms. Drouse. Good afternoon, Your Honors. Juliana Drouse. I represent Brian Scott Milland. I'm going to address the issue of improper opinion testimony. Your Honors, throughout this trial, the government elicited opinions from several witnesses, bankers and lawyers. And they were opinions based on these people's specialized knowledge gained through years of work involving banking practices and banking law. And the opinion that was expressed was that the defendants were guilty of fraud. For each of these witnesses, the government began their testimony by asking about their education and professional backgrounds, their qualifications as experts on the subject as to which they were going to be presenting testimony. And after describing the professional experiences, the witnesses testified as to their opinion, as to the legality of the defendant's actions. Witnesses were improperly to compound the problem, the expert witness instruction cautioning the jury not to give this testimony undue weight was not given. And that's particularly harmful here because what we're talking about are subjects which most people are totally unfamiliar. I mean, if people want to talk to me about banking law and well, before this case, I know a little bit about banking law now, but banking law and, and banking practices, you would have to rely on people who have experience in these fields to, to know, to understand the testimony and to understand what's going on. And can I, can I ask you, let me characterize the testimony in a slightly different way. And you can tell me that's not what happened, but I wouldn't go look at the and, and I say, did you review this transaction or participate in the, in the, in the discussions with the other side or a bank official? And they say, yes. And say, did the, did the transaction as proposed concern you? And the person says, yes, because in my view, it would have violated the bank laws, would have been illegal. Is he being an expert or is he testifying about his recipient reaction to the events at the time? His conclusion as to the meaning of the, of the information, it's expert testimony. What if he's saying in my, you know, I was, I was alarmed because when I looked at this transaction in my understanding, it would violate the banking laws or put us, put our capital at about why he was concerned at the time. It's concerned. It actually is not relevant. His, his, his, his, his concern that this might violate the law is, is a conclusion, first of all, and it's not relevant. It's not something that should be presented to the jury. These witnesses testify and use the word fraud and that the defendants committed criminal activities were involved with criminal activities. That is so prejudicial. That's ridiculously prejudicial. Right. But I guess what judge Hurwitz is saying is that these were, these were not random witnesses. They were all witnesses who, you know, touched upon the investigation of this alleged fraud in one way or the other. And they were being asked about actions they took some years prior and why they took them. And in the course of being able to explain that part of their reason was that they viewed some of the conduct as illegal. And I explained some of the things that they had done, which were relevant to the overall trial. And so it just seems the nature of the offense here implicated witnesses with specialized training in a way that some other offenses may not. Your Honor, you're absolutely right that these were not random witnesses. All of these witnesses were, well, particularly the lawyers. Okay. They were called by the banks to get an expert opinion. That was their role to give the bank an expert opinion. And you cannot give legal conclusions. They weren't random. They were called specifically by the banks. They consulted with the banks specifically as to give their expert opinion. And then they testified as to their expert opinion, their conclusions. And like I said, their conclusions, they testified in court and told the jury that the defendants in fact committed fraud. That is highly prejudicial and should not have been. Help me on the record in this case, which is massive. So I may have, I may not be exactly correct on this. I see an objection to the testimony because they weren't disclosed as witnesses and the witness rules, experts, I'm sorry. And the expert rules weren't complied with. Was there a relevance objection? There were objections as to prejudice. No, that's really a separate question. Was there a relevance objection? They don't believe so. Prejudice is always, you need some other problem with evidence for prejudice to come in. So I'm trying, the only objection made was that they weren't properly disclosed as experts. Am I correct? Correct. We've taken you over too, but I cut you off. So if you had one other thing you'd like to say, please do. I'd like to reserve my time for rebuttal if I may. You don't have any, but we'll give you some. Okay, thank you. All right, let's hear from the government. Good morning, may it please the court. Francesco Valentini for the United States. I would like to begin with a Sixth Amendment claim. The district court correctly denied the defendant's request to dismiss with prejudice the new counts in the superseding indictment. The defendant's speedy trial clause claim fails because the defendants have not asserted any delay that is cognizable under the Sixth Amendment. Instead, what they are trying to do is essentially to fit a square peg in a round hole. The defendants moved in November of 2016 to dismiss new charges that had just been asserted a month earlier in October 2016, and only those new charges. They did not claim any improper delay in bringing the original charges that had been filed in March of 2014 to trial on the then projected date of March 2017, nor could they because they repeatedly agreed time and again to set aside time under the Speedy Trial Act. Mr. Valentini, on that point, I want to understand your position. So your position is that as long as there is no objection to the original indictment, and that the original trial date doesn't violate the Sixth Amendment, then you can add whatever you want in a superseding indictment on the day of the new trial? We don't take that position. We think that, first of all... I think you do. I think you do. Now, to be sure, the new charges weren't tried on the day of the new trial, but it seems to me your argument that there was no undue delay in bringing the charges means that you can wait till the day of trial to bring them as long as the judge and the defense, and as long as everybody agrees to postpone the trial to give the other time to set aside sufficient time to prepare. No, that's not our position. I have several responses to that. First of all, as a factual matter, as your Honor just hinted, this superseding indictment was brought about six months before the then projected trial date of March... No, I understand, but you're saying the critical date is the date of the superseding indictment, and therefore it seems to me that your argument necessarily leads to the conclusion that it would have been okay to bring it on the day of trial, too, as long as sufficient time was given to prepare. That statement is only true if it has several critical qualifications. First of all, new charges that are part of the same charge as was initially brought under the Blockberger test or any other same act test, those will inherit the same clock as the original indictment. That's something that we recognize in our briefing, but more importantly, to the extent that that delay is otherwise asserted, that there is substantial and robust backstop against government delay. If it just doesn't happen to come under the Sixth Amendment or the speedy trial clause... I'm still stuck with nothing you tell me suggests that my hypothetical to you isn't the government's position, or that it can deliberately wait until the date of trial as long as the additional charges meet the Blockberger test come out of the same transaction, and that there's no problem with doing that as long as the judge gives the defense sufficient time to prepare for the additional charges. Now, I'm not saying that's wrong, but it does seem to me that's your position, isn't it? Again, we think that in that case, there will be other... the speedy trial clause will not be the reason why the government does not bring those charges, but there are other reasons why those charges will not end up inside on the same day as the original charges. No, I'm just... No, we have a separate problem. They wouldn't have sufficient time to prepare if they were just told the day before. The judge remedies that by giving them more time, but... And I'm not suggesting your position is wrong. I just want to make sure I understand it. Your position is as long as it arises out of the same events, as long as it's a superseding indictment, and as long as there's no complaint that the amount of time between the superseding indictment and the eventual trial isn't so short that the defendants couldn't prepare, then there's no Sixth Amendment problem. That's right. No Sixth Amendment problem. But again, there's robust backstops against the defendants ever being prejudiced in that kind of situation. Those backstops are statutory, they're constitutional, and they're institutional. They're statutory because the primary, as the Supreme Court explained in Lovasco, the primary line of defense against pre-indictment delay, which is really the essence, the crux of defendants' claim in this case, and of Your Honor's hypothetical, is the statute of limitations. In this case, there is no longer, there was a statute of limitations claim very briefly in the district court. Of course, the statute of limitations was not breached in this case, so that is out of the picture. There's also statutory backstops in Rule 14 and Rule 48, which is what the district court in this case invoked to correct what was perceived to be a delay. The district court can sever the new charges, or it can dismiss the new charges without prejudice, so they can be tried separately. And there's also constitutional backstops. To the extent that the statute of limitations does not sufficiently protect the defendants' interests, the Constitution does protect against pre-indictment delay, but that's a due process clause, and it sets a very high standard for the reasons that Justice Marshall incisively articulated in Lovasco itself. We don't want to force the government to bring premature charges. That's a completely different standard. Mr. Valentini, your opposing counsel focused very intently on the part of the district court's findings that's most problematic for the government, which was essentially the deliberate and intentional withholding of charges, and so I think, why don't you address that particular issue directly, because I think, I'm not trying to put words in opposing counsel's mouth, but he indicated that should have a very strong place in the analysis here, and so I'd like you to respond to that aspect of the record. Absolutely. Analytically speaking, because there's no cognizable delay here, under Barker v. Ringo, the court should not even reach any of the other factors, including the second factor that my opposing counsel discussed. But if the court gets to that, opposing counsel omitted an important aspect of the district court's findings. The district court expressly found that it did not find that faith on the part of the government. The district court did use the word intentional and deliberate, but what the district court meant by those words is volitional. The government didn't know, and that is true at some point before October 2016, that it would bring superseding charges. It also informed defense counsel that this happened. The district court imposed a superseding indictment, and the government at that point brought the superseding charges. So what the district court in context meant by ruling out bad faith, which is, I think, what my opposing counsel's characterization untruthfully conveyed, what the district court found was simply that the delay was volitional, and the charges could have been brought even before that. As to the investigation having been... Why weren't they brought earlier? We did take comfort in the fact that the district court set a deadline for superseding indictment, and we brought the superseding indictment by that deadline. And again, the superseding indictment could have been brought earlier. And for that reason, when the district court dismissed without prejudice, we were ready to undertake, and this brings me back to the institutional reasons way, we really don't have any institutional interest in delaying charges. That's important. It's because in this case, for instance, as in the vast majority of cases, it is the government that... Well, it is the government that always carries the burden of proof beyond a reasonable doubt, but it's also the government that puts on the vast majority of the evidence. It is the government's witnesses whose memories fade over time. It is government evidence that tends to not become available over time. So there's not only statutory, not only constitutional, but also institutional reasons why there is robust backstops against the type of pre-indictment delay that the opposing counsel is arguing in this case. But none of those delays have anything to do with the Sixth Amendment, and that's why their claim fails. As a matter of course principle, the Sixth Amendment, the speedy trial clause protects someone who has been accused of an anti-disruption against the anxiety of remaining accused of that charge for a long time. But of course, no one languishes accused of a charge until the criminal charge has been brought. And so here in this case, for instance, the defendants were not languishing under the new charges that were brought in October of 2016, in 2014, in 2015, in 2016. The nature of the claim they're bringing is a pre-indictment delay claim, and that's a claim that sounds, if at all, under a special limitation claim, which fails in this case, or a robust claim, that would fail in this case, but not even attempted to bring it. Also, as a matter of practical considerations, Your Honor, Judge Brass, before I think you hinted at this, there is no dispute, well, I should correct myself, they may dispute or not, but this court's decision in record makes it clear that the government was free to file a new indictment rather than a superseding indictment in October of 2016, bringing exactly the same charges that were brought in the superseding. And I think I, at least for my part, I understand your argument on this. I did want to get your take on some of the other issues. And Judge, I'm sorry, were you saying something? No, I was not. Go ahead, Judge. I am, like Judge Brass, I am interested in the other issues, and I'd like you to address the 8035 issue for a moment. And let me just, let me lay out my concern about it. The statement that was admitted was a statement of the translator, of the stenographer, if you will. I mean, she's in effect saying, this is what he said. I listened to what Mr. Garrett said, this is what he said. But she's not there. And so we don't know whether or not she made that statement close to the time of the transcription or not. And as to Mr. Garrett, his adoption seems to come not close to the time of the statement, but significantly thereafter. So the only question here is whether the record that was admitted, and again, not in a vivid form, only read into the record, was made or adopted by Mr. Garrett. And this court has emphasized personally in the Patterson decision that the standard for the admission of evidence under 803, I'm sorry, 8035 is a flexible one, and one where the district court has substantial discretion. And it was fair in this case for the district court to conclude that Mr. Garrett made the record because the evidence showed that the process that led from his dictation to the production of the memorandum was not only entirely reliable and accurate and time-tested, but also 100% mechanical and non-discretionary. Garrett described the process- The made seems harder for you under the court reporter line of cases. Adopt, I think, seems a little different because it seems that there is a basis to say he adopted it through his process. I don't know about made, though. To be sure, we think that the adopted route is clearer. It doesn't have a- On the adopted, I want you to respond to your friend's argument that by putting dictated, but not, when did he adopt it? When did he adopt it? I think the answer to that question, I think I would revert largely to some of the points that asked before, by instituting a process which was 100% non-discretionary, where he instructed the transcriber to write down the words verbatim and let him know if there were any questions at all, anything that the transcriber did not understand, and by- So your sense is that he adopted the statement in advance of it being transcribed? I put it by instituting a process that was- What authority are you pointing to for that, then? What's the cases or something else that you're going to say supports that? Again, beyond, of course, the decisions that established that this, of course, had broad discretion in interpreting the disability under 8035, I don't have a case that has this fairly unique fact pattern, but what is striking about this case is the overwhelming evidence that Mr. Garish testified about this time. And again, one could view this statement as having been made by Mr. Garish himself, because the only setting to action and mechanical process was essentially no different than what could be, for instance, an electronic transcription process that would not require, I think, maybe my opposing counsel will disagree, but we don't think it will require another witness. Can I ask a question? Let's assume that there was an error here. Would your argument be, then, that it was harmless? Yes, yes. Any error here would be harmless for several reasons. In this particular case, you have him saying that he did this. Mr. Cutting confessed. How do you get around the power of that confession? Because Mr. Garish also testified as to the content of what Mr. Garish told him in the course of the interview, which was the substance of the memorandum itself. And Mr. Garish said, I don't, he testified that Mr. Garish did not deny at all that the letters were false. So the content of the memorandum and Mr. Garish's contemporaneous trial testimony align quite closely. In addition, there's also legal reasons why the evidence would be, the omission of the evidence, if any error happened, which we don't think it did, would be harmless. One is because the evidence would have been admissible under the residual exception. This is precise. I know it's a rare case where the residual exception can be invoked to perform the omission of evidence that is otherwise found not to fall under one of the heresy rules. This is precisely the type of case for which the residual exception exists. There were abundant guarantees of trustworthiness. The evidence was, again, we think that Mr. Garish's own testimony about the substance of his communication with Mr. Cutting was extremely probative, but the memorandum was more probative. There may be other evidence that would be more probative as to Cutting. I'm not sure Garish's testimony, other than the memo, gets you there though. He testified a bit about the meeting, but eventually he said he couldn't recall anything else. Well, he did squarely testify that Cutting did not deny that the letters were false, which in some ways is as powerful as a very similar testimony to the substance of the memo. I know you want to move on to, and we'll give you time to address other questions, but one of my concerns here is the admission of the statement, as opposed to simply showing it to refresh his recollection and then have him testify about the meeting. It's a little bit different to admit the statement than to just show it to him, and you didn't do that. You could have attempted, I think, to treat this as something that refreshes his recollection, but you introduce it for the truth of the matter under 803.5. Can you address that? Does that make it worse than if you'd simply said, well, take a look at this document. This is to refresh your recollection about what happened in the meeting, and then he says, oh, yeah, now having looked at this, I do remember it. He doesn't say that. He doesn't say, I now remember the meeting, having looked at this. You just introduced this at a point where he says, I just don't remember the meeting at all. That's correct, and to be clear, we don't think that it makes things worse. It would be a different question. I think that there is no dispute that it would be proper to present the document to refresh the witness's recollection. Right, and that's what concerns me here, that you went farther. You didn't just give it to him to refresh his recollection. You introduced it independently for the truth of the matter. Right, and that's why we're having a discussion about the claim, as opposed to... That's right. That's right, as opposed to the admissibility, the propriety of the government's action, and the witness's testimony being a foregone conclusion, but that doesn't make the evidence excludable, non-admissible under 8035. So we find, especially on this fact, the evidence inadmissible will run confidence for a number of principles that this court has found, and that inform the scope of Rule 8035. First, again, this court has said that this court has a broad discretion to decide whether the testimony is admissible under Rule 8035. The defendant's position would also lead to the counterfactual puzzling of results, which I think, Judge Brass, you hinted at before, that Garish does adopt this memorandum as a transcription of his dictations for the purpose of conducting his business, and yet the writing is not considered an adopted document for purposes of the rule of evidence. The defendant's position also divorces the hearsay perception from its fact-heavy reliability underpinnings, and I think it's important that the defendant's position also departs from the business record exception in the sense that, in that context, custodians routinely, by design, testify about the trustworthiness and mechanical nature of a process, just to ensure, and that testimony suffices to establish the reliability necessary for the admission of hearsay testimony in that context. They're basically asking for a very similar, our position is that the nature of concern is very similar under 8035, and for that reason, this report did not abuse discretion in this evidence. I would also mention just very briefly, to the extent that this court reaches harmless error, the evidence is clearly harmless, at least it is harmless with respect to Mr. Cutting, it is absolutely clearly harmless with respect to Mr. Vonage and Mr. Miller. I see I'm already over my time, but I would like to touch on some of the other claims. Please address Mr. Harris's argument about the knowing instruction. The district court did not err, plainly or otherwise, in instructing the jury regarding the mens rea for money laundering or misapplication of bank funds. The defendants do not contest that instructions specific to money laundering and specific to misapplication of bank funds were accurate and complete, including as to mens rea. The contest is said that the interplay of one sentence in the general knowingly instruction somehow cast doubt or potential confusion about the mens rea instruction reflected in the specific instructions for money laundering and misapplication of bank funds. But the district court did not lift the model, the pattern during instruction and simply give that instruction. He modified it surgically in response to the defendant's objection and he added a clause to prove that an act was done knowingly immediately before the sentence that they claim is arguably defending sentences, which just says that the government is not required to prove that the defendant knew that his or her acts were unlawful. And with that critical fix, nothing in the general instruction regarding knowingly could possibly spill over and cast any doubt about different mens reas that applied specifically to the misapplication of funds counts where willfulness was defined separately or the money laundering counts where the separate requirement that the defendant must know that the proceeds were criminally obtained is set forth. And again, there's no dispute that that specific instruction on its own was proper. And so the modification in this case resolves entirely the problem that arose in time where that modification was absent. And so the second sentence of the general knowingly instruction was, so to speak, allowed to float away and have arguably caused potential confusion with if applied to specific instructions specific to the money laundering counts. That didn't happen in this case. Any error would be harmless for the simple reason that the defendant's claim that the instruction did not sufficiently require the jury to find that the defendant knew their fraud and misapplication of funds were unlawful. But it really blinks reality to believe the defendants of the level of sophistication of Mr. Cudding, Lonich, and Mellon, all of whom... Could you respond to Mr. Harris's argument about omission? Why was Mr. Lonich required to disclose facts that he did not disclose? So as to the fraud by omission, this court in Milanovich, which was a non-bank decision, made clear that the fiduciary relationship must exist before there is the type of duty that is a gateway requirement in this case. But he also made clear that the definition of a fiduciary duty is not the traditional legal definition of fiduciary duty. And he left it intentionally, and he made it, and he held that the definition was intentionally broad and included a six-factor relationship that created an obligation. What is there in this relationship when you're on the other side of someone who's negotiating a deal that comes even close to being a fiduciary relationship? And again, I think we would like to think of this in terms of, based on the substance, I understand that Milanovich used the term fiduciary relationship, but we would like to think of this, we think that the better way to think of the issue is in terms of duty to disclose as opposed to fiduciary duty, because that comes with baggage, legal baggage that Milanovich disclaimed. But I think the clearest example in this case comes from the representation that Mr. Lonage made to CBRE and Freddie Mac, not the original misrepresentations when they bid on the promissory note, but when the defendants took out financing, refinanced the property. And in that application, Mr. Lonage stated that the information they provided was true, complete, and correct, and was made in good faith. So Mr. Lonage agreed with the representation. To me, that's an argument that that statement was fraudulent or misleading. But that's a separate argument from whether or not independently omitting something can be the basis for wire fraud. So I understand your argument that that statement was false because the information they provided was not complete. But that's a separate argument, it seems to me, from whether or not an omission by itself can be the basis for wire fraud in the absence of some special relationship. That may be why your argument that this was harmless error has some force. But I don't still get to the argument that the omission by itself comes in simply because he was a lawyer on the other side of a deal. Again, we wouldn't say that simply because it was a lawyer on the other side of the deal that would suffice, understand a sufficiency challenge that the defendants don't bring in this case. So we're not taking that position. But as to the representation that the statement was complete, yes, that was a false statement. And liability and guilt could be found on a affirmative misrepresentation based on the falsehood of that statement. But thinking of this in terms of the recipient of that statement, a counterpart in a transaction by his counterparty, everything I am disposing to you is true, complete, and correct. That aside from whether that statement itself is true or false, it does bestow upon the maker of that statement a duty to then actually follow up and adhere to that statement and that representation. But going back to harmlessness, yes, because that statement is also a misrepresentation, an affirmative misrepresentation on its own terms, that would also support, that also makes this error in this case harmless. And as to harmlessness, this is not just factual harmlessness, which it is for many reasons, among one of them, the one that Your Honor just pointed to. This is harmless as a matter of law. This is the textbook Yates error. There's no dispute, and the defendants did not dispute, that the instructions that were given were actually legally correct. They were textbook instructions from the patent jury instruction. They don't say that the district court should have said more about the threshold requirement. The district court instructed the jury as to two theories of liability, affirmative misrepresentation and fraud by omission. As to fraud by omission, the instruction makes crystal clear, I'm sorry, that the jury had to make a threshold finding of the requisite duty to disclose. And their claim is entirely a claim of insufficient evidence. That's why they refer to it in their reply as a claim based on evidentiary foundation. And so if there wasn't sufficient evidence under the legally correct instruction that the court gave, then because, as always, courts assume the jurors followed the instruction, the jury would have simply found, would have simply moved on from any theory of omission. I think their position is maybe a little more nuanced than that. They're basically saying not only is evidence insufficient, so insufficient that it essentially crossed the line of putting a legally unavailable theory before the jury. That seems to be really what they're arguing. To be clear, your honor, that is not a substantive distinction. It's just a relabeling of an evidentiary insufficient evidence claim, basically saying there was insufficient evidence to send this particular theory to the jury as an error of law. But in some substance, it says the same thing. It basically says there wasn't sufficient evidence, and so this particular theory should have not gone to the jury. Well, the jury knew what to do if it did not find sufficient evidence of this actual relationship, which is move on from that theory. How do you, you know, Mr. Harris made the point about the acquittal on count 16 as being uniquely probative on this issue. What do you say in response to that? I think there are several responses. First of all, as we explained in our brief, there were other, definitely more widely interpreted, well, first of all, courts are always reluctant to divide any particular understanding by the jury. But even engaging in that exercise, first of all, there were other significantly more likely reasons why the jury could have reached that conclusion. First of all, the fact that the evidence on the interest in access was not as strong. The only communication was someone who was based in California with respect to the accounts, so that could have been a weakness that the jury found this positive in. As Joshua had hinted at before, that or any number of other conclusions, including the fact that, for instance, Mr. Lonish did make corrective representations to his initial misrepresentation in connection with that account, could account for a different, could explain the jury's differential burden. It's inherently a speculative exercise. I think there are reasons that are much more, provide much more compelling explanations of what could have happened in the jury room. Ultimately, we don't know, and we're always reluctant to engage. Mr. Valentini, we've taken you way over time, but we wanted to. So let me just ask my colleagues whether they have additional questions for the government. I'm good. If not, let's do this. Let's put a couple minutes back on the clock for Mr. Keninger for rebuttal, and let's put, given that he had twice as much time as everybody else, roughly, let's put a minute back on the clock for rebuttal for the other two appellants counsel. Mr. Keninger, go ahead. You're still muted. Thank you. With respect to the Speedy Trial Clause, first principles, the Sixth Amendment attaches at the time of accusation. It is not offense specific. The court should look to Betterman, the Supreme Court's opinion that describes, and I'm quoting at page 1614 of the Supreme Court reporter, at the founding, accused describes a status preceding convicted. This is a status-based issue, and the Sixth Amendment applies to a unique period of time between any accusation and conviction. The government has asserted that the district court's finding merely meant that it was volitional, that it voluntarily filed charges. The district court wasn't assessing whether filing charges was involuntary. It was about deliberate intent or deliberate attempt to hold back. And I want to direct the court to excerpts of record 1405, because the government made the same argument at the rehearing on its motion, suggesting that it was intentional, only that we intended to bring the charges. And the district court responded as follows, I'm quoting, well, it was also intentional in the sense that you could have brought them in the first instance. They've been there the whole time, and so it was an intentional choice to go just on the one, and then bring the second set late in the day. This is not merely volitional. With respect to the suggestion that they only brought these because they waited because there was a deadline, the government had resisted that deadline multiple times. And as to prejudice, the government's arguments about proof beyond a reasonable doubt and that it's more presumptively prejudicial to them, Doggett rejected that. It held that it was unclear to whom it was more prejudicial. And in Justice O'Connor's dissent in Doggett, she advanced the argument that the government does here. Of course, the court rejected that. With respect to the 8035. Before you get on to 8035, let me ask you something I didn't get to ask you before. Let's assume that the government never charged your client until the time of the superseding indictment. In other words, there was no original indictment. There was just a superseding indictment. And we then go back to, would there be a speedy trial problem? If he is never arrested or accused of anything, then the never arrested or accused of anything, but just charged at the time of this of the superseding indictment with everything in the superseding indictment? No, because the government has not constituted him an accused. However, that and that's it. But yeah, there would be no Sixth Amendment right that attaches if he's not arrested, not under indictment. But what the Sixth Amendment, what the Supreme Court's precedent demonstrates is, it's the government that makes someone an accused. And once they take that step, they need to be aware of the requirements of the Sixth Amendment. It's not simply the due process clause at that point, even with respect to superseding charges. That's why the second factor is important. The court can ask why they did this. That is what the court should look to. And I want to emphasize the government has not cited a single case, not one that holds that these rights are offense specific. With respect to 8035, since I know you wanted to get to it, what's your closest case to this situation? This is a strange case in the sense that the statement was made by the witness himself, transcribed by somebody else, who wasn't. And then the witness later is confronted with it. Is there any case close to this? I mean, I think the Mornin opinion from the Third Circuit, which involved a, and this also goes to the government's arguments about general arguments about reliability. In Mornin, the statement had issued with a transcription by a typist and an official examiner in Canada of a deposition. And so under those circumstances, the Third Circuit, notwithstanding arguments about reliability, said it does not come in as a recorded recollection. Your Honor, Judge Hurwitz, you asked, did he review this essentially? And I think notably my colleague could not point to a time in which he reviewed it until seven years later. And this is important because what the government is arguing is that through a process that a witness can adopt a document without ever reviewing it. And that is fundamentally at odds with the Senate report that underlies the adoption of Rule 8035. Quoting from page 62 of our reply brief, the Senate report says that when the verifying witness has not prepared the report, but merely examined it and found it to be accurate. Well, I'm still asking, maybe the Third Circuit case is on point, but here the witness at trial is the same person who made the statement. And so what I understand technically the stenographer made the statement, but is there any case, just accept my characterization for a second, that has this factual scenario in it that you can find? Yeah, I understand your legal arguments, and they may be correct. I'm just trying to see if there's a case. I can't point to a case that 100% on all fours, but all of the cases that we cite in our brief are so germane and they address this precise issue. And I want to take issue, Judge Hurwitz, and I know it was a hypothetical, with your characterization that this is a stenographer. My colleague, Mr. Valentini, referred to this as mechanical. There is a human component here, and we know nothing about this person and whether they were a good employee and whether they actually followed Mr. Garish's job correctly may be enough for Mr. Garish's legal practice. It is not enough to debate the conviction in a criminal trial, and it's not enough for the rules of evidence. Okay, thank you. Thank you. I gave you two minutes and we used five. Thank you. I appreciate that. Mr. Harris. Thank you, Your Honor. So first, on the knowing the instruction, nothing in the change in the transaction involved criminally-derived property. Exactly the same situation as in Terman, where it said knowingly engaged in transaction, which he knew involved criminally-derived property. The problem is the same. On harmlessness, which government counsel raised, here there's absolutely no other finding in the case by the jury that was required here, which was knowledge that this loan from the bank were criminally-derived property. So nothing, you know, shows that this was not, and it has to be harmless beyond a reasonable doubt under this, of course, decisions when the standard is stated wrongly in the instruction. And then, finally, he suggested plain error. Here, I would say the objection was absolutely sufficient. It was directed to the second sentence specifically, and the grounds were it will allow a party to argue that the defendant doesn't need to know his acts are unlawful, and that's not necessarily true. And that's a 7693. Mr. Harris, it would be helpful for me if you would respond to the government's argument that your client represented that everything he leaving out, omitting a material fact into that representation. Okay, well, that turning then to the omission argument, you know, the fraud by admission point, that's exactly the problem here. Because the jury was instructed, yes, it could be an affirmative misrepresentation based on half-truths, also confined based on omitted facts, and we don't know which they found there. No, I'm asking this question. When somebody represents to the other side that they've made it complete, that what they've said, actually said is complete and accurate, doesn't that necessarily include within it a representation that I haven't left out something that would have been material? Well, no, I think under the precedent and under the instruction that's given, that's a separate basis for finding liability. It may be a separate basis, but isn't the fact that one omitted something, when, so the judge says, he said it was complete and accurate. If you find that he omitted something, you can find that he engaged in fraud. Why isn't that an accurate instruction in light of the Because an instruction you can find based on omitted facts would allow the jury to make that finding without regard to its relationship to other statements, without regard to the half-truth affirmative misrepresentation theory. So it's a separate theory. And under Griffin and other cases, if there's a legally insufficient theory, that requires reversal because we simply don't know. And I would just say, it seems like the point you're arguing is really more a factual insufficiency. The government had some arguments as to why there was an informal relationship of trust here. They included the statements that Judge Hurwitz mentioned. They included the fact that Mr. Lonitz was a lawyer. They included the fact that there was testimony from people on the other side of the transaction as to what they thought. That evidence maybe was not enough, and maybe the jury could have rejected it factually. But why was it wrong legally to give the instruction? Well, because it was insufficient as a matter of law. None of those things create a fiduciary relationship under Shields and Mellon Elpage that just, it should not have gone to the jury. And I would direct the court to the opinions in Verona and Fulbright, which we cited in our briefs. They're absolutely on point here in similar situations. In Verona, the jury is absolutely instructed correctly as to what it must find factually. That certain, it has to find that there were five people who the defendant supervised or organized. And the government put up certain possibilities that could meet those five. And they said, well, they were instructed and there were five people, so that's enough. It was up to the jury. And the court said, no, five of them as a matter of law didn't qualify because they were customers and they could not qualify for purposes of the statute of the issue here. And that required reversal and specifically applying Griffin. Same thing in Fulbright. Mr. Harris, I want to, I'm going to cut you off unless one of my other colleagues has a question, because I think you've made your point there and it's in your brief. Thank you. Judge Rask, Judge Corker, any other questions for Mr. Harris? Mr. Harris. Submitted at this point since the issue that I addressed was not addressed by the government. Okay. I was going to say the case is submitted, but of course it's not because we're going to move on to the second part of the case, which is the sentencing part. And I had notes here about how you were going to divide that and I misplaced them. So give me a second. Well, why don't you remind the hearings? Five for Mr. Kennedy and five for Mr. Harris. Is that how we're doing? Going to do the sentencing part? That's correct. Your honor. Thank you. Okay. Let's see if I can do a better job of keeping us on time this time. I will try as well, your honor. Mr. Koeniger, Stephen Koeniger, excuse me, on behalf of Mr. Cutting. Your honor, the 20 level loss enhancement that the district court applied in this case was based almost entirely on one fact and one fact alone, a finding that the defendant caused the failure of Sonoma Valley Bank. In particular, the district court adopted the probation officer's fact sentencing at the experts of record 630. This of course resulted in a ninefold increase in the sentencing exposure and under due process to admit the court was required to apply a clear and convincing evidentiary standard to that finding. But it's not just the size of the loss, your honors. There are at least two reasons that the heightened burden of proof was required here. First is contrary to the government's assertion, the bank failure finding was not based entirely on the extent of a conspiracy. This is not a situation in which the court is merely counting up the amount of drugs that all the co-conspirators possess, counting up all the bad checks that were passed. This is a downstream complex factual determination and it required clear and convincing evidence. Does it matter? Yes. Does it matter? See, I'm having difficulty figuring out why the burden of proof or standard of proof matters. The district court seems to have said, I'm going to find that you caused the bank failure based on the pre-sentence report and the FDIC report incorporated into the pre-sentence report. That report was made before failure. So even under a ordinary burden of proof, not clear and convincing, but just preponderance, I'm not sure how that evidence establishes that these defendants caused the failure of the bank. That evidence was, the FDIC report was compiled before the bank failed. It said it's in danger of failing. There are many possible causes of it. So it looks like I'm missing something. Did the district court base the finding on anything but the pre-sentence report? I don't believe so. And I agree with your honor that that report predates it. I think that causes a problem. I do think the standard of proof matters. I agree that that would render that incapable of proving it under either standard. Of course, it is a constitutional matter. The burden of proof that the court is applying is important, but that's a good point, your honor. And I want to discuss the pre-sentence report because it is based on a one-line assertion from the FDIC report regarding the bank. And there's an important issue here, your honor, which is the court, the PSR refers to paragraph 24, if I might have a moment, refers to paragraph 24 of the PSR, which is also incorporated in the probation officer's addendum. And the PSR identified the following reasons for the failure of the large lending relationship with Majellefi, the fact that there were large losses on those loans, and that the bank was unable to obtain funding because Majellefi purportedly took up 74 percent of the bank's risk. This was objected to. So, Judge Hurwitz, it's important. My client objected to this. And so the government needed to come forward with proof of the factual basis. And there's something important here, which is that the PSR's assertion of 74 percent of the risk appears to be wrong. When you look to paragraph 24 of the report, it quotes the statement that Majellefi represented 74 percent of the total risk-based capital at the bank. And the probation officer from that one statement extrapolated to say that, from this quote, to say that the bank failed from capital deficiency, quote, because 74 percent of their risks were taken up by Bijan Majellefi. But the FDIC report, so in other words, this asserts, this suggests that Majellefi is responsible for three quarters of the loans, three quarters of the risk. And what's important here is if you look to the following page of the FDIC report, and I'm referring to supplemental records from the term of art, and it does not appear to be based on a 100 percent scale. And in particular, the PSR, or excuse me, the FDIC report states at the page that I mentioned, 2127, that the bank's entire construction, commercial real estate portfolio represented 480 percent of the adjusted total risk-based capital, and that its construction loans were 188 percent. This is significant. This is a fair point, and I want to ask just a related point just to make sure I understand. It was a $10.3 million write-down, right? The bank had to write off its books. Yes, Your Honor, at the time of the December 2009 examination. Of that $10 million, it appears that some of it relates to charged conduct, but some of it does not. Is that factually correct? Correct. 70 percent of what was written down relates. Well, let me be clear on that, Your Honor. My 70 percent is both uncharged, which is the 132 village loans. Those were not charged as part of the fraudulent conspiracy. And as well as the Petaluma Greenbuyers one and two loans, that's acquitted conduct for Mr. Cutting because he was acquitted on counts three and four of making false bank statements, which required proof that he either knew that the credit reports were false or that he intended to defraud. Okay, but across all defendants, it was about $3.3 million for the village square loan. That is a majority loan, but that's uncharged conduct. The total, I don't have the precise figures, but that there were two 132 village loans, and they were not charged conduct. That is correct. That's included within the $10.3 million, which is part of allegedly led to the bank collapse. Yes, Judge Brass, and I'd like to direct your attention to trial exhibit 2676, which is an excerpt of records 4617 through 4620, which sets forth this accounting. Okay, that's helpful. Thank you. And so if I might just return to the point about the total risk with respect to the FDIC report, the concern here is that A, the government did not provide evidence to substantiate that 74% of the bank's risk, right, which is a different issue than the total risk based capital, because the FDIC report shows that that is not a 100 point scale. And the concern here is that statement made it into the addendum. The district court relied on the PSR. And the concern is that the district court was apparently misled into believing that Max Leffy's loans were three quarters of the bank's risk, which is not accurate. I see I'm well over time. Thank you, Your Honor. I'm sorry, Judge Hurwitz, it appears you're trying to, I can't hear you. I'm not sure if you're- Sorry, there you go. At least I'm not a cat. Is the only evidence that the district court relied on in imposing this enhancement, the PSR in the addendum? Well, the record is not- Was there any other evidence in the record at sentencing before the judge that she relied on in finding that the defendants caused the failure of the bank? The government put in three exhibits into the sentencing record with its sentencing submission. It's not clear whether the district court relied on those. Right. She seems, when I read her ruling, it seems to rely on the PSR. So my question is, I guess, assuming the other three exhibits were considered, are they sufficient to show that your clients caused the failure of the bank? They're not, Your Honor. And this is discussed at length in my brief, and they're actually law enforcement officer reports relating secondhand. There's no live, there's no testimony from, and I want to be clear, it can't be fairly disputed that the issue of what caused the bank and what the effect of the financial crisis on requires specialized knowledge. I mean, this is the epitome of expert testimony. There's no live testimony. There's no declarations under oath from anyone explaining these factors. And the three documents, the only three documents submitted were law enforcement reports with very conclusory assertions. And they weren't referred to by the judge when she said- No, and I want to, and Judge Ferguson- No, I think I'm taking you over. Those are factual questions. Thank you, Your Honor. Mr. Harris. Thank you, Your Honor. So the government did not meet its burden to show defendants' relevant conduct was a but-form proximal cause of the failure of the bank here or the harm to FDIC or Hart for all the reasons Mr. Keninger said, and they apply equally to Mr. Lonage. But there are additional reasons why the government certainly did not meet that burden with regard to Mr. Lonage would have to do with his late entry into the conspiracy and the relevant conduct rules that make him not responsible for things done prior to that in 2009. So for him, we're really talking only about the House Co. loan. And the impact of that, there's no demonstration that it's a but-for cause. Indeed, the government's submissions at sentencing show exactly the opposite. And if we look at the FDIC's victim impact loss submitted at sentencing, it really tells the whole story. And this is at ER 774-776. It shows loss on a loan-by-loan basis, total of $28 million. It shows the loss from the House Co. loan at zero. Perhaps more importantly, because we talk about charge-offs here and whether the charge-offs, you know, whether it was $10 or this chart shows $16 million, it shows charge-offs, you know, prior to the 2010 failure, charge-offs for the House Co. loan, zero. Not only that, it shows that FDIC was able to sell the House Co. loan to West America for full par value, the entire value, the entire $9.47 million of the loan, and that then West America, in turn, collected the entire loan. So, zero loss also to West America. So, there's no basis to show a but-for approximate cause with regard to Mr. Lonitch. The investigative report, the only other thing submitted, they also find no support for finding, I guess, Mr. Lonitch. Again, they attribute failure to some loans. Not sufficient here to meet the burden for reasons Mr. Cunningham says, but none of those apply to Mr. Lonitch. So, you know, ultimately, the court just said, oh, well, you know, it happened in 2010, and that was after you came on, so that was on your watch. That's simply not sufficient here. There's just absolutely no explanation why this fully collateralized loan, which resulted in no charge-offs, which FDIC was able to at full par value and resulted in no loss even to West America, you know, was the cause of the loss enhancement here. Is it possible in this circumstance to focus on the effect of the loan on SVB as opposed to the people who eventually collect on it? In other words, if SVB was fraudulently induced to enter into a loan and that loan on its books made it unstable, could there be a causation of the failure even though later on the money was collected? Maybe so, but let's look at the effect on SVB because it's fully collateralized. I mean, the government on appeal relies on a report that wasn't even in their sentencing record, but what does that report show? This is the Chavez, you know, December 29 memo. It shows that it's fully collateralized. In fact, they value the collateral as $13 million on a $9.5 million loan, and again, there are no charge-offs. If we're worried about the charge-offs and putting the bank in jeopardy here, there's absolutely zero charge-offs in their loans. So yes, looking directly at the effect on SVB prior to the failure, there's just no basis to show that the government has met its burden here, which by the way, it is clear in convincing evidence. I don't think it's needed. It's not met under any standard, but yes, I mean, the standards for claim convincing clearly met here under Valencia. You know, this is a loss, increased defense levels 20 times, increased length of sentence nine times, the factors that have been considered important, the final two Valencia factors clearly met here. The government tries to make an exception for conspiracy, but the rationale of that, you know, ample opportunity to have proved all this at trial has no application here. I mean, because the judge ruled out any evidence with regard to failure of the bank at trial. Yeah, and it struck me that normally for some enhancements, they would be proved up at trial. Some of us, at least some of the elements of the enhancement would be proved up at trial, perhaps amount of loss or things like that. But this is a strange enhancement because it has to do with the ultimate effect of the crime on the bank. So that seems to cut against the government's argument that this should be an exception to the rule. Yeah, absolutely, Your Honor. There was just nothing at trial that went to the issue that was the issue of sentencing, you know, which was the causes of this loss and particularly with regard to relevant conduct. In Lonig's case, I mean, that we had to look at his relevant conduct only after his entry, certainly nothing in trial touched that in any way or, you know, gets you out of clear and convincing evidence. So that's true. Turning briefly to restitution, same issues here. Also requires, you know, but for approximate causation, also not responsible for liability caused by co-conspirators, all the same issues apply there and make the restitution order also in error. I think the four-level enhancement for jeopardizing the safety and soundness of the bank doesn't quite apply to launch for the same reasons here. Again, an adequately collateralized loan, no charge-offs is just not contributing in that way. And finally, the 10 or more victim enhancement just clearly is a matter of law under, you know, Ninth Circuit decisions here in Armstead and Brown. You don't count victims unless they're part of your calculation under 2B1.1. Here, there were two victims for that calculation and those were FDIC. I take it on the 10 victim points, your argument is that if there's not but for approximate causation on the bank failure, the 10 victim enhancement falls also for the same reason? That would be an additional reason why it fails. But even accepting what, you know, the court, finding of causation, the court made it very clear there, I'm basing the loss based on two victims, FDIC and TARP. So that enhancement simply has, simply fails on both of those grounds. Yes, does any of my colleagues have questions? If not, thank you, and we'll turn back to Mr. Valentin. Put 10 minutes on the clock. Good morning, again, Francesco Valentin for the United States. Under any standard of proof, the district court did not clearly err in applying a 20-level enhancement based on the actual loss, the result of the defendant's scheme. Info evidence for both, there was info evidence in the trial and sentencing record for both of the key factual findings that underpinned on which that enhancement is based. Let's just focus on what was actually relied on for the findings because the PSR cites one FDIC report and that's what the district court relied on. I don't think there's anything else that was relied on. Well, so the district court did not say that it relied exclusively on a particular aspect. The district court said, I will use the losses from the PSR. The district court had presided over a 31-day trial, which while the causation was not itself a question presented for decision, there was info evidence of what happened and the kind of impact that it could have had on, as it did have. I have a question to follow up on Judge Preston. What's the district court's obligation, whatever the burden of proof, whether it's clear and convincing or preponderance, what's the district court's obligation in making findings when such a large enhancement is going to be imposed? She surely couldn't have just said, well, I find you caused the bank to fail and not cite any evidence, could she? This court ordinarily does not require as part of the preliminary guidelines findings that the court offer any particular level of explanation as to any particular enhancement. Okay. Now, when the court does say, I'm basing my finding on X, are we then free to look at the rest of the record to see whether or not, had she looked at it, she might have based her finding on X and Y? Absolutely. Especially in a case like this where the district court really said that it was agreeing with PSR's amount of loss, but did not exclude other evidence and it presided over a 31-day trial. My problem with the 31-day trial is none of it was devoted to whether or not the magnitude of the crime caused the bank to fail. It was just devoted, the most you could get out of that trial was the magnitude of the losses caused by the defendant's conduct. But that doesn't tell me why the bank failed absent something else. If they'd done this to Chase, it wouldn't have failed. So, I need more to determine that their conduct caused the bank to fail. And that's what I'm looking for in this record. Where do I find it? And while the district court did not identify those items of evidence, as my opponent acknowledged, the government submitted three separate interview memorandums from three witnesses who had deep understanding of SB's working and what caused it to fail. Even on their own, those have some shortcomings, but I don't see how you can say the district court relied on those and the district court essentially discounted the government's entire submission because it, at the very end, produced a loss number that was basically 2x of what the PSR had said. So, there's no indication that the district court relied on those three reports at all, I don't think. Well, there's no express evidence or an express explanation, but there rarely is in this court a sentencing, and the district court has never required it, that the district court expressly cite chapter and verse every piece of that. No, but what we have here is the district court not only not accepting it, but if anything, seemingly disclaiming the entire submission for coming in late in the game and trying to offer an amount that was so much different than the PSR. I would like, your honor, to provide a clear line in the sand about what the district court discounted. The district court discounted the figures that the FDIC and TARP submitted because they were submitted after the PSR, but those are a completely different exhibit to the government's sentencing memorandum. The district court did not at all discount, either expressly or implicitly, the three declarations, the three, I'm sorry, interview memorandums from the three regulators who were most familiar, intimately familiar, with what causes could be fulfilled. And again, if you can touch on like the FDIC, he said, he told the investigators, and it was reported to the district court, SVB failed due to the action of Cutting and Mellon, who issued several loans to Madge Laska, resulting in massive losses, which depleted the bank's capital. The actions of Cutting and Mellon sent the bank onto a trajectory of bleeding to death, and as a result, the bank failed, and the FDIC sustained massive losses. William Wilson, DFI's senior financial institution examiner for SVB, came to the same conclusion. His interview memorandum states that SVB's lending relationship with Madge Laska affected the safety and soundness of the bank to the point it caused the bank to fail. Let me ask you the question Judge Bress was asking slightly differently, and I think he may have a follow-up also on it. Assume for a moment that district court had said, I'm imposing the enhancement based solely and entirely on the PSR. No other evidence. Would there be sufficient evidence in the PSR alone to support the enhancement? In the PSR alone, there is a reference to the FDIC report. We think that's sufficient because the district court was entitled to credit that finding, and I understand that now my approving counsel is raising all sorts of new quibbles about whether 74% refers to total risk-based accounting. My problem is the PSR seems to rely entirely on an FDIC report prepared before the failure of the bank, which says it may fail, and if so, there will be a lot of causes. Assuming that characterization is correct for a moment, would that be enough to impose the enhancement? I think if that were the only evidence, this could be a close question. So if I'm right in my characterization of that evidence, your argument necessarily is that the district court was entitled to rely on these three additional submissions, even though it didn't say it did. Right, and we think that the obvious, especially given the presumption of regularity that attaches to all judicial proceedings, we think that district court must be presumed to have relied on all the evidence to indict the district court for not having cited on an oral record a sentence in all the evidence, in this case that has a massive trial record but also substantial sentencing record, to sort of hold a district court to citing specific items of evidence in order to support its factual findings, I think will impose a severe unprecedented and extraordinary burden on sentencing courts. Another factual question, in the government's sentencing memorandum, did the government discuss the FDIC report that was referenced in the PSR? Yeah, I think we cited, we discussed the PSR. I don't think we went to the underlying report directly. Was the FDIC report attached to the government's sentencing memorandum? No, no, no, no, no. The FDIC report was not attached to the sentencing memorandum. The FDIC report had been the subject of several discussions during trial, had been handed up to the court, and it was cited in the PSR. Again, I'd like to push back on one mischaracterization, mischaracterization by my opposing counsel with respect to the 74% of total risk-based capital. The PSR, in the paragraph my opposing counsel cited, quotes in quotation marks exactly that thing. Then, later in the paragraph, the PSR paraphrases that quoted language by saying that this represented 74% of their risk, of the bank's risk. And there may be some quibbles about whether that characterization is correct or not, but the quotation in Mr. Covington's memorandum appears at paragraph 24. There is a quotation of 74% of total risk-based capital, which is what the FDIC report itself said. I also wanted to touch on the standard of proof very briefly, and also then would like to touch on the sentencing of Mr. Lonich. But with respect to the standard of proof, the guideline standard is, by default, preponderance of the evidence. This court has this clear and convincing evidence applies only in exceptional circumstances. Specifically, when a defendant might otherwise receive a disproportionately harsh sentence based on culpable conduct that was not charged in the indictment. But, and to answer your question before I'm just pressed, none of the loss amount in this case was based on uncharged conduct. In this case, the- Wait a minute, I don't think that's correct. I mean, the theory of loss here was not the announced that the banks lost on the loans. There is some number associated with those and that could be calculated. And I don't know that it's $20 million, but there's something there. But the theory of the FDIC report, as well as the PSR, is that a combination of loans led to the bank's collapse and some of those loans were not charged. I would like to sort of clarify what the defendants were charged in this case. The defendants, in this case, in some counts, were charged with making misrepresentation of specific loans. But the key count of which they were convicted that spans the entirety of this loan is the bank fraud count, where they were in, I would turn to paragraphs 14 to 16 of the 2017 super city indictment, where the defendants were charged from approximately 2005 until approximately 2010. The defendants devised and executed a material scheme to defraud Sonoma Bank and to obtain money from the bank by means of materially false and fraudulent pretensions. But the Village Square loan was not part of that. Your Honor, it was part of the conduct. If I may read the following paragraph, and I don't mean to- My apologies. No, no, I don't mean to bore the court with an extensive presentation of the record, but it says specifically, the defendants carried out a scheme to defraud, whereby money from Sonoma Valley Bank was paid and directed to medial assets in person and entities controlled by medial assets that exceeded the legal lending limit within which the bank was required to operate for its policies and procedures. The Board of Directors, the FDIC- I'm sorry, were they tried for the Village Square loan? Was it part of the charges at all? Yes. Evidence at trial about the Village Square loan? Yes, there was evidence in terms of a trial about the Village Square loan. Was there evidence at trial that the Village Square loan was fraudulently obtained? Again, the defendants were charged. That's why I'm emphasizing the charge here. The charge here was a conspiracy. For some of these loans, the loans themselves were fraudulent on their face. For other loans, the misrepresentation was not as to who was taking out the money. It was about the legal lending limit and whether that loan crossed into a lawful legal lending limit. All of the loans that were taken out by medial assets or on behalf of medial assets are part of the same scheme. Some of them included specific misrepresentations and we charged- Here's my problem, and maybe we're charged. I would think charged conduct is the conduct for which the jury is asked to find the defendant guilty or innocent or acquit. You're saying there can be charged conduct for which the jury is not asked to make a finding? The foundational principle that we're referencing here is the principle that this court did under reaffirming Collazo recently, a defendant who is convicted of a conspiracy is held criminally responsible for the entirety of the conspiracy. That's what happened here. The conspiracy- Does the indictment allege that the village loans were part of the conspiracy? To be clear, there is no specific mention of- Okay. The indictment doesn't allege that the conspiracy extends to these loans. You put on some evidence that the loans are trial, but didn't ask the jury to make any finding about them. Nonetheless, you're saying it's part of the charged conduct. That's why I'm having difficulty with your argument. I understand, Your Honor. I see I'm not quite getting across, but my point is that the charge was for a conspiracy that spanned from 2005 until 2010 to obtain loans in violation of the legal language. I want to bring this argument to a close, but I wanted to ask you, because I want you to respond to Mr. Lonitch's counsel's argument, and tell me why he's responsible for everything that occurred before he joined the conspiracy. Yes, Your Honor. I think there's four reasons why he's not responsible for the action of his co-conspirators from before joining the conspiracy, but there's reasons why he's responsible for the losses that those loans caused to SVD. The first, at the critical juncture for the loan failure, this was in August of 2010, the one-to-one house loan, which was eventually repaid and not resulting in a loss, was in trouble. This was not a health loan. There were late payments. In March of 2010, SVD declared a default event. Okay, but you do agree that the house loan was not the but-for or proximate cause of the failure of the bank? The one-to-one house loan in isolation. No, we wouldn't agree with that. Okay, so let's assume the house loan caused a loss, or somehow was a bad loan, just for the moment. Tell me again why Mr. Lonich is responsible for anything but the house loan. Mr. Felsenfeld, to the extent that the district court found that, with respect to Mr. Lonich, it was clear to the district court that he could only be held accountable for some relevant content. The district court acknowledged the limitations of the guidance, and then it found that the content in which it engaged caused the collapse of SVD. I know the district court found that. I'm just trying to figure out whether there was sufficient basis in the record to support that finding. One important aspect of the one-to-one house loan, for instance, is that this was a Ponzi scheme, a heart. Loans were taken out, and then they were paid off in part with the proceeds of later loans. The one-to-one house loan, as we have a chart in that, the proceeds of the one-to-one house loan were used to perpetuate the fraud with respect to the loans that had already been issued, and that made Mr. Lonich responsible for the eventual loss of those loans. We don't know what would have happened to those loans without Mr. Lonich becoming an instrument of the perpetuation of the Ponzi scheme by directing or helping the Ponzi scheme. I'm skeptical of that, but where is that in the PSR and the responses to the PSR and any findings? At least with the other ones, we have an FDIC report. I'm not sure where the theory is located in the record beyond you making the argument as to how it could be supported. Where was it in the PSR or otherwise? With respect to the one-to-one house loan, most of the evidence was in the prior record. None of the facts you're citing are outside the record. I understand that, but the theory here is that Mr. Lonich, who's involved in one transaction that involves a loan that turns out to be fully collateralized and fully paid, is nonetheless responsible for the entire loss of the bank. He didn't work at the bank. He's one person who had one loan with the bank, so where in the record do you sync all this up? Because your brief makes the argument, but I don't see it in the objections to the PSR. In the probation officer's response to Mr. Lonich's objection. The evidence was before the district court made a finding. It is true that it's not spelled out as a distinct theory in the PSR, but the PSR is really used to offer facts that can be objective or not, and then there is trial evidence that is before the district court. I keep coming back to it. I understand your theory. I understand the district court made a finding. I'm trying to that the house co-loan, which is the only thing I think Mr. Lonich is responsible for, caused the failure of the bank. A number of things. Some of them I hope I already mentioned. Another one is this notion that the loan was fully collateralized, but that is not true. Rather, the trial evidence made clear. Let's assume for a moment, just for purposes of argument, that the house co-loan went belly up and no penny was ever paid back on it. Nine, 12 million, some number like that. Whatever the number was a loss to the bank. Why was that the proximate and but-for cause of the failure of the bank? Because that loan allowed the other loans to ultimately survive until they were no longer recoverable, and at that point, the result of the loss was in turn resulted in the collapse of SBB. This is the trial evidence. These are the inferences that the district court was asked to draw at the sentencing hearing. The evidence was before the court. The court was deeply familiar with the matter, and there are still inferential steps that the district court would have had to draw, especially with respect to the one-on-one house co-loans, but the district court is only required to make findings. It's not required to offer an explanation. The review in this court is of the same sort as an evidential review for sufficiency of the evidence at the guilt stage. We don't look into how the jury could have reasoned. We only look for the fact. To be clear, and I think we've reached the end of our discussion on this. My question is, was there evidence from which the district court could have made this conclusion? It's not enough that a district court makes a finding. The defendants come to us and say that finding was wrong because it's not supported by the record, and so what I'm trying to do is find out not simply whether the district court made the finding that he caused the loss, but whether or not the record supports that. I'm not saying for the moment she needed to make more specific findings. I'm still having trouble finding the evidence in the record that would support the findings she made, so we're talking across each other on this a little bit. Judge Corker, Judge Gracchia, further questions for the government? I do not. I do not. This case then will be submitted with my thanks to all counsel for their excellent arguments and briefing. We're going to take a recess before we move on to the rest of the calendar, and that will allow those not involved in the remaining cases to move on. We'll be back in session in five minutes.
judges: Hurwitz, Bress, Corker